UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SUSANA CAPASSO

        Plaintiff,

v.                                    Case No:   2:12-cv-499-FtM-38DNF

COLLIER COUNTY,

        Defendant.

_____/

## ORDER[1]

This matter is before the Court on Collier County's Motion for Summary Judgment (Doc. #42) filed on August 25, 2014.  Plaintiff Susana Capasso filed an Opposition to Defendant's Motion for Summary Judgment (Doc. #48) on September 25, 2014.  Thus, this matter is ripe for review.

## BACKGROUND

**A.  Overview of Plaintiff's employment**

Plaintiff, a Cuban female, worked as an Investigative Supervisor in Defendant's Code Enforcement Department ("CED") from June 18, 2007, until April 18, 2011.  (Pl.'s Dep. 53:7-9; Doc. #54-5).   When Plaintiff started, David Scribner was her direct supervisor, and Michelle Arnold was CED's Director.  (Pl.'s Dep. at 53:12-19).  Plaintiff

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

was one of five investigative supervisors, and she directed approximately six investigators.  (Doc. #49-8; Doc. #49-9).

Plaintiff's four-year tenure at CED was contentious from the beginning.  Some CED investigators and supervisors did not accept Plaintiff's hire because she transferred from another department and was not an internal promotion.  (Pl.'s Dep. 79:10-25, 155:19-156:3).  She also had no prior experience in code enforcement.  (Pl.'s Dep. 52:13-16). Because of her management style, three of Plaintiff's investigators asked to be removed from her team.  (Pl.'s Dep. 76:23-77:5, 157:16-21).  Another investigator filed a complaint against her alleging discrimination and retaliation.  (Doc. #42-1 at 88-89; Pl.'s Dep. 123:8-125:15, 135:8-23).  Plaintiff acknowledged "from every angle within [CED, she was] not winning friends and influencing people."  (Pl.'s Dep. 158:9-13).

Additionally, Plaintiff and Scribner neither got along nor liked each other.  (Doc. #48 at 2; Pl.'s Dep. 136:10-18; Flagg Dep. at 46:7-9, 47:21-23).  Approximately seven months into Plaintiff's tenure, Scribner presented Plaintiff with a "Supervisory Mentoring Program" because of issues with her assigned cases and management skills.  (Doc. #42-1 at 90; Pl.'s Dep. 141:14-142:9; Serrano Dep. 157:22-158:5, 158:18-23, 160:16-20). "'The intent of this program [wa]s to provide an environment of learning in a supportive setting using skills of an experienced supervisor to enhance the skills of a less experienced supervisor," and it was not to "be viewed as anything but a mechanism for learning.'"  (Doc. #42-1 at 90).  Under this program, Scribner arranged for Marlene Serrano, a Hispanic female and CED's Operations Manager, to meet regularly with Plaintiff and help with her case management.  (Doc. #42-1 at 90; Doc. #49-8; Serrano Dep. 159:14-160:4).  Plaintiff, however, was distrustful of "the idea of a contractual

mentoring program" and viewed Serrano as her peer and competition for a promotion. (Pl.'s Dep. 142:24-146:3).

Plaintiff's work environment temporarily improved when Diane Flagg became CED's Director on July 1, 2008.  (Doc. #48 at 5-6; Doc. #49-13; Doc. #49-14; Doc. #49-15).  According to Plaintiff, Flagg "provided guidance to [her] that she had not been getting from David Scribner."  (Doc. #48 at 5).  She also "appreciated Diane Flagg's attention and mentoring" and the new challenges Flagg offered to her.  (Doc. #48 at 5).  Flagg even "rescued" Plaintiff from Scribner's purportedly unfair annual performance evaluation of her in July 2009.  (Doc. #48 at 5; Pl.'s Dep. 297:12-16).  Scribner gave Plaintiff a score of 360 points of 500.  (Doc. #50-1; Pl.'s Dep. 297:8-11).  Flagg intervened and reevaluated Plaintiff based on her "distant observation" of Plaintiff's performance.  (Pl.'s Dep. 297:12-16; Flagg Dep. 46:1-17, 51:17-52:20).  Flagg gave Plaintiff an evaluation score of 425 points of 500.  (Doc. #50-3; Flagg Dep. 51:7-12).

## B.  Plaintiff's 2010 performance evaluation and performance improvement plan

For disputed reasons, Plaintiff and Flagg's relationship deteriorated sometime in 2010.  (Doc. #48 at 6; Pl.'s Dep. 260:1-10).  According to Plaintiff, Flagg scrutinized her work, addressed her in an accusatory tone, monitored her lunch hours, asked her near impossible questions about her cases, and was generally cold and terse with her.  (Doc. #48 at 6).  Plaintiff tried to speak with Flagg about their deteriorating relationship on several occasions, but matters allegedly worsened.  (Doc. #48 at 6; Pl.'s Dep. 260:6-10).

Plaintiff and Flagg's relationship hit rock bottom on or about July 14, 2010, with Flagg's annual performance evaluation of Plaintiff ("2010 Evaluation").  Flagg gave Plaintiff a score of 300 points of 500.  (Doc. #50-3).  In four of five categories, Flagg rated

Plaintiff "Successful" or "Highly Successful." (Doc. #50-3 at 2-6). In the outlying category, Flagg rated Plaintiff as "Development Required," and wrote "[Plaintiff] should seek to develop processes to assure scheduled deadlines are met. Bi-weekly case reviews require improvement." (Doc. #50-3 at 4). Flagg further commented, "[Plaintiff] has the potential to be an outstanding leader. She should seek to develop time management skills to assure that deadlines are consistently met and seek to improve collaborative relationships with her colleagues." (Doc. #50-3 at 6). For the Key Results Area ("KRA") portion of the 2010 Evaluation, Flagg scored Plaintiff as "Successful" and "Highly Successful" in three of four areas. (Doc. #50-3 at 7-8). In the outlying area, Flagg scored Plaintiff as "Development Required" because she had past due activities and open cases. (Doc. #50-3 at 7). For comparative purposes, Plaintiff's 2010 evaluation was 125 points less than her 2009 Evaluation. (Flagg Dep. 51:7-15). Flagg testified that the 125-point decrease was the product of Plaintiff reporting directly to her during the 2009-2010 evaluation year, whereas Plaintiff reported directly to Scribner during the 2008-2009 evaluation year. (Flagg Dep. 51:20-52:20, 58:22-59:12,63:1-16, 67:1-68:11).

Since Plaintiff received "Development Required" scores in her 2010 Evaluation, Flagg, following Defendant's policy, placed Plaintiff on a Performance Improvement Plan ("PIP"). (Flagg Dep. 71:1-4. At or around the time of the 2010 evaluation, Flagg advised Plaintiff that she would receive a PIP and explained they would work together to finalize the PIP. (Pl.'s Dep. 276:1-10; Flagg Dep. 71:11-16).

On or about August 4, 2010, Flagg gave Plaintiff a draft PIP for her review and comments. (Flagg Dep. 71:17-19; Doc. #50-4). Flagg scheduled another meeting with Plaintiff on August 9, 2010, to discuss the draft further. (Pl.'s Dep. 276:14-277:4).

Plaintiff missed the meeting.  (Doc. #42-1 at 93; Pl.'s Dep. 277:5-21).  Instead, she delivered her response to the PIP to Defendant's Human Resources Department ("HR") on August 9, 2010.  (Doc. #50-4; Pl.'s Dep. 278:25-279:8).  Plaintiff responded, in relevant part, that

> I believe my poor evaluation and the performance improvement plan has been devised in retaliation for my voicing my thoughts in my self-evaluation and in discussions with Diane Flagg regarding emphasis placed on quantitative performance measures at the expense of qualitative performance measures.
>
> . . . .
>
> I have been with Code Enforcement for three years and during that time I have been subjected to discriminatory remarks and unlawful harassment and my performance evaluation followed by a performance improvement plan is just another case in point.

(Doc. #50-4).  This was Plaintiff's first written response to the 2010 Evaluation and PIP. (Pl.'s Dep. 280:5-9).

## C. Plaintiff's formal complaint of national origin discrimination

On August 13, 2010, Plaintiff emailed Amy Lyberg, Director of HR, with a formal complaint of national origin discrimination against Flagg.  (Doc. #50-5).  In the email, she alleged

> [s]ince [she] moved to Code Enforcement, Diane Flagg continually singles me out due to my national origin.  She speaks to me as if I do not understand English and she subjects my written work to intense scrutiny which others in my group do not receive.  She has also arbitrarily downgraded my performance, and she routinely excludes me from group activities and benefits for no apparent reason.  Additionally, Diane Flagg has also approved of or taken part in blatantly discriminatory remarks which have been directed to me by Patti Petrulli. . . .

(Doc. #50-5).  Lyberg thereafter launched an investigation into Plaintiff's complaint.  (Doc. #53-2).

On August 17, 2010, Lyberg met with Plaintiff and Flagg to review Plaintiff's concerns.  (Doc. #53-2).  At that meeting, Plaintiff stated, among other things, she heard Patti Petrulli, another investigative supervisor, speak derogatory comments about Hispanics.  (Doc. #53-2 at 1-3).  Petrulli's alleged comments were twofold.  First, at a biweekly management team meeting in July 2010, Plaintiff explained how she used a "year, month and day" format to save her open case reports.  Petrulli allegedly commented, "[w]ell in America . . ." and then explained the way she should save the report.  (Doc. #53-2 at 2-3).  Second, Petrulli allegedly commented that Hispanics "don't take care of their properties."  (Doc. #53-2 at 3).

Approximately eight days later, Lyberg met with Plaintiff, who provided additional information and exhibits related to her complaint.  (Doc. #53-2 at 3; Doc. #53-1).  On August 31, 2010, Lyberg again met with Plaintiff and Flagg to gather additional information and handle any new concerns.  (Doc. #53-2 at 4).  During this meeting, "[Plaintiff] noted that she had observed that the level of professionalism in the office had seemingly improved in the past week or two."  (Doc. #53-2 at 4).  Finally, Lyberg interviewed six CED employees on September 9, 2010, all of whom stated they neither witnessed nor heard inappropriate comments about Hispanics in the workplace.  (Doc. #53-2 at 4, 7-12).  After completing the investigation, Lyberg issued a report finding that Plaintiff had not been subject to national origin discrimination.  (Doc. #53-2 at 5).

## D.  Aftermath of HR's investigation

Because of Plaintiff's discrimination complaint on August 13, 2010, and the subsequent HR investigation, Flagg suspended finalizing the PIP.  (Flagg Dep. 108:5-21).  After Lyberg issued her report, the PIP was executed on or about October 28, 2010.

(Doc. #54-1).  Under the PIP, Plaintiff's short term goals included improving her leadership skills, setting and meeting deadlines, developing a collaborative relationship with her peers, and reducing the number of overdue activities assigned to her team.  (Doc. #54-1).  The PIP also set a standing weekly meeting with Flagg to discuss her progress.  (Doc. #54-1).

On November 15, 2010, Flagg issued Plaintiff her first Behavioral Action Plan ("BAP").  (Doc. #54-2).  In general, a BAP "is a document used to administer progressive discipline actions to employees."  (Doc. #55-1).  The BAP issued to Plaintiff indicates that she continued to underperform in managing her assigned cases.  (Doc. #54-2).  The specific offense that prompted the BAP stemmed from a case management activities report that Flagg sent to her supervisors on November 5, 2010, in preparation for the biweekly management team meeting.  The report showed one of Plaintiff's investigators had numerous past due activities.  When Flagg ran the same report three days later, it showed a majority of the investigator's cases were no longer overdue.  Flagg asked Plaintiff about the change, and Plaintiff explained that her investigator worked over the weekend to complete the overdue activities.  The next day, Flagg discovered the investigator did not complete the activities as Plaintiff had told her; but rather, Plaintiff allegedly changed the due date of the investigator's activities.  (Doc. #54-2).  According to Flagg, Plaintiff violated Defendant's standards of conduct and insubordination policies.  (Doc. #54-2).

On December 2, 2010, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging national origin discrimination and retaliation.  (Doc. #12-1 at 1).  Flagg did not recall when she first

became aware of Plaintiff's EEOC charge, but testified she "would [have] be[en] notified fairly soon after it was filed."  (Flagg Dep. 137:21-138:6).

On December 8, 2010, Plaintiff emailed Michael Sheffield, the assistant county manager.  (Doc. #42-1 at 97).  Plaintiff wrote, in pertinent part, that

> I am the target of a viscous, unrelenting campaign by Diane Flagg to destroy my reputation and terminate me because I have spoken up about unfair treatment, inequities in the workplace and the hostile work environment [Flagg's] actions have served to perpetuate.
>
> . . . .
>
> Diane [Flagg] has a reputation for retaliating against employees who she either considers a threat or who speak up openly her unfair treatment and so most people are afraid to speak up.  At this point, I find myself in a no-win situation so I don't have much to lose.
>
> . . . .
>
> I believe the truth behind her campaign against me personally is that she fears the truth about our blight presentation program and will come out and you will realize you are being deceived.

(Doc. #42-1 at 97).

On December 12, 2010, Flagg issued Plaintiff a second BAP.  (Doc. #54-3).  This time, the BAP came with a three-day suspension.  (Doc. #54-3).  Flagg cited Plaintiff for four violations that allegedly warranted the second BAP: (1) Plaintiff did not forward forty cases to Marlene Serrano on November 17, 2010, in accordance with Flagg's directive earlier that month for her to do so; (2) she failed to bring her work-issued cell phone to a training seminar in Fort Lauderdale, Florida on December 1, 2010; (3) she failed to follow the procedure for notifying Defendant of her absence from work on December 8, 2010; and (4) she failed to follow Defendant's procedure in issuing a notice of violation to a community member on December 12, 2010.  (Doc. #54-3).

8

**E.  Plaintiff's FMLA leave**

On January 21, 2011, Defendant approved Plaintiff for roughly three months of leave under the Family and Medical Leave Act ("FMLA").  (Doc. #42 at 11; Doc. #48 at 15).  On April 18, 2011, Ken Mayo, Defendant's Employment Operations Manager, sent Plaintiff a letter stating that her request for a personal leave of absence was denied.  (Doc. #54-5).  Since Plaintiff was not medically cleared to return to work, Mayo explained she would be discharged, effective that day, unless Defendant received medical documentation clearing her for work.  (Doc. #54-5).  Plaintiff never provided such documentation, and thus Defendant discharged her.  (Doc. #42 at 11).

**F.  Plaintiff's right to sue letter from the EEOC and subsequent federal lawsuit**

On December 14, 2011, the EEOC sent Plaintiff a Letter of Determination.  (Doc. #12-1 at 2-4).  Although the EEOC found insufficient evidence to establish Defendant discriminated against Plaintiff based on her national origin, it found sufficient evidence to establish Defendant retaliated against her for complaining of discrimination.  (Doc. #12-1 at 3).  Thereafter, the EEOC sent Plaintiff a Notice of Right to Sue on June 11, 2012.  (Doc. #12-1 at 5).

Armed with the Notice of Right to Sue, Plaintiff commenced this employment discrimination action on September 7, 2012.  (Doc. #1).  In the two-count complaint, Plaintiff alleges Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et. seq. ("Title VII"), and the Florida Civil Rights Act of 1992, Ch. 760, Fla. Stat. ("FCRA") by discriminating against her based on national origin and retaliating against her for complaining of discrimination.  (Doc. #1; Doc. #12).  Defendant now moves for summary judgment on both claims.  (Doc. #42).

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is genuine if there is sufficient evidence such that a reasonable jury could return a verdict for either party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Similarly, an issue of fact is material if it may affect the outcome of the suit under governing law.  Id.

The moving party bears the burden of showing the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In deciding whether the moving party has met this initial burden, courts must review the record and draw all reasonable inferences from the record in a light most favorable to the non-moving party.  See Whatley v. CNA Ins. Co., 189 F.3d 1310, 1313 (11th Cir. 1999).  Once the court determines the moving party has met this burden, the burden shifts to the non-moving party to present specific facts showing a genuine issue of fact exists to preclude summary judgment.  See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "The evidence presented cannot consist of conclusory allegations, legal conclusions or evidence which would be inadmissible at trial."  Demyan v. Sun Life Assurance Co. of Can., 148 F. Supp. 2d 1316, 1320 (S.D. Fla. 2001) (citing Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991)).  Failure to show sufficient evidence of any essential element is fatal to the claim and the court should grant summary judgment.  See Celotex, 477 U.S. at 322-23.  Conversely, if reasonable minds could find a genuine issue of material fact then summary judgment should be denied.  See Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1532 (11th Cir. 1992).

**<u>DISCUSSION</u>**

For the following reasons, the Court grants Defendant summary judgment on the national origin discrimination claim, but denies summary judgment on the retaliation claim.

**A.  National origin discrimination**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To prove unlawful employment discrimination, a plaintiff may present "direct evidence, circumstantial evidence, or statistical proof."  Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1274 (11th Cir. 2008).

Plaintiff maintains that direct and circumstantial evidence exists to support her discrimination claim.  (Doc. #48 at 16-17).  "'Direct evidence of discrimination is evidence, that, if believed proves [the] existence of [a] fact without inference or presumption.  As [Eleventh Circuit] precedent illustrates, direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor.'"  Rojas v. Florida, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (citation omitted); see also Wilson v. B/E Aerospace, Inc. 376 F.3d 1079, 1086 (11th Cir. 2004) (finding the comment "even though women aren't typically in that type of position we'll see what happens when we throw your name out there to corporate" not to correlate directly with an intent to discriminate on the basis of sex); Burrell v. Bd. of Trustees of Ga. Military Coll., 125 F.3d 1390, 1393-94 (11th Cir. 1997) (finding the comment that "[the employer] wanted to hire a man for the position because too many women filled First

Federal's officer positions" not to be direct evidence of sex discrimination). As direct evidence, Plaintiff points to (1) remarks that Flagg allegedly made about Plaintiff's English-speaking skills; (2) Patti Petrulli's generalization on how Hispanics maintain their lawn and her comment that "in America" Plaintiff should use a specific date format; and (3) Amy Lyberg's allegedly inadequate investigation into her discrimination complaint. (Doc. #48 at 16-17). In order to find discrimination based on this proffered evidence, the Court must make an inference or presumption. Thus, this is not a direct evidence case.

Lacking direct evidence, a plaintiff must prove her discrimination claim circumstantially using the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that framework, the plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified to do the job; (3) she was subject to an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. See id. at 802; Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010).

If the plaintiff makes a *prima facie* case, a rebuttable presumption arises that the defendant has acted illegally. See Alvarez, 610 F.3d at 1264 (citations omitted). The defendant can rebut that presumption by articulating a legitimate, nondiscriminatory reason for its action. See id. If the defendant does so, the burden shifts back to the plaintiff to produce evidence that its proffered reason is a pretext for discrimination. See id. Despite the shifts in the burden of production, the plaintiff maintains the ultimate burden of persuasion to show that the defendant intentionally discriminated against her. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); EEOC v.

Joe's Stone Crabs, 296 F.3d 1265, 1273 (11th Cir. 2002). To overcome summary judgment, the plaintiff most do more than simply show only that the employer's proffered reason is false. See Reeves v. Sanderson Plumbing Prods., Inc. 530 U.S. 133, 148 (2000) (stating, even if the plaintiff disproved the employer's proffered explanation, the employer would still be entitled to judgment as a matter of law if the record "conclusively revealed some other, nondiscriminatory reason for its decision"). With these principles in mind, the Court will address Plaintiff's discrimination claim.[2]

### 1. *Prima facie case*

The parties agree that Plaintiff belongs to a protected class, was qualified for her job, and her discipline and discharge constitute an adverse employment action. They dispute, however, whether Flagg treated a similarly situated, non-Hispanic employee more favorably than she treated Plaintiff.

"'To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that [s]he and the employees are similarly situated in all relevant respects.'" White v. Verizon Florida LLC, No. 8:09-CV-1533-T-23TBM, 2010 WL 3942902, at *3 (M.D. Fla. Oct. 5, 2010) (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)). "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the

---

[2] In Count I of the Amended Complaint, Plaintiff alleges Defendant intentionally discriminated against her based on her national origin in violation of Title VII and the FCRA. (Doc. #12). The Court's analysis of the Title VII discrimination claim applies equally to her FCRA discrimination claim. See Alvarez, 610 F.3d at 1271 (11th Cir. 2010) ("Because the FCRA is modeled after Title VII, claims brought under it are analyzed under the same framework . . . the state-law claims do not need separate discussion and their outcome is the same as the federal ones." (internal and other citations omitted)); Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998) ("The Florida courts have held that decisions construing Title VII are applicable when considering claims under the [FCRA], because the Florida act was patterned after Title VII." (citations omitted)).

employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holifield, 115 F.3d at 1562 (citation omitted). The Eleventh Circuit requires "the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Holifield, 115 F.3d at 1562 (citation omitted).

Here, Plaintiff fails to name a similarly situated non-Hispanic employee whom Flagg treated more favorably. This failure is fatal to her *prima facie* case. See id. (stating the failure by a plaintiff to show the existence of a similarly situated employee mandates summary judgment (citation omitted)). Plaintiff generally asserts, "[t]here is sufficient evidence presented to infer that [she] was treated differently than her peers." (Doc. #48 at 18). As support, she relies on Kitchell Snow's testimony regarding Flagg's alleged treatment of Plaintiff during the biweekly management team meetings. (Doc. #48 at 18). She characterizes Snow's testimony as follows: (1) Flagg asked Plaintiff more questions about her case than another supervisor who had the same issue; (2) she used an accusatory tone with Plaintiff and looked noticeably agitated and aggressive; and (3) her communication with Plaintiff "made it plainly obvious to everyone in the meeting that Flagg had an in evil motive in her mind when she was communicating with [Plaintiff]." (Doc. #48 at 18). Even the most favorable view of this testimony does not save Plaintiff's *prima facie* case. Without identifying an allegedly similarly situated non-Hispanic employee, Plaintiff's argument is empty. The Court is not required to sift through the record in order to devise arguments on Plaintiff's behalf so she can meet her *prima facie* burden. In

short, there is simply no evidence that Flagg treated Plaintiff's similarly situated comparator more favorably than her.

Moreover, Plaintiff paints Flagg as a serial discriminator whose victims include her, David Scriber, Kitchell Snow, Marlene Serrano, and Blanca Nieves. (Doc. #48 at 7-9). Although colorful, Plaintiff's picture is unconvincing. The fact that Flagg's purported "victims" are both Caucasian and Hispanic undercuts her argument that her national origin motivated Flagg's behavior towards her. See Alvarez, 610 F.3d at 1266. What is more, Plaintiff and Flagg had a copasetic working relationship for at least eighteen months, so much so that others in the CED "thought [Plaintiff] was favored by Diane Flagg." (Doc. #48 at 5-6). Plaintiff has not plausibly explained why Flagg suddenly began to discriminate against her because of her national origin. Despite Flagg having never referenced Plaintiff being Hispanic (Pl.'s Dep. 303:20-22), she surmises her Cuban ethnicity was the trigger for the deterioration in her relationship with Flagg. Such conjecture, however, is insufficient to overcome summary judgment. At most, Plaintiff has shown Flagg offended many with her abrasive, demanding, and difficult management style.

In short, although it is clear Plaintiff and Flagg had their differences, Plaintiff "cannot turn a personal feud into a [national origin] discrimination case by accusation." McCollum v. Bloger, 794 F.2d 602, 610 (11th Cir. 1986) ("Personal animosity is not the equivalent of sexual discrimination and is not proscribed by Title VII." (footnoted omitted)). Accordingly, the Court finds that Plaintiff has failed to establish a *prima facie* case of national origin discrimination.

### 2. Legitimate, nondiscriminatory reasons and pretext

Even if Plaintiff could establish a *prima facie* case of discrimination, she has failed to show Defendant's legitimate, non-discriminatory reasons for her 2010 Evaluation and ensuing discipline were pretext.

As stated, if the plaintiff meets her *prima facie* burden, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  See Brown v. Ala. Dept. of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010).  If the defendant is successful, the burden shifts back to the plaintiff to show that the defendant's purported reason is merely pretext for discrimination.  See id. at 1181-82. To show pretext, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation omitted).

Here, the record reflects that Defendant had a legitimate, non-discriminatory reason for the 2010 Evaluation and the disciplinary actions, namely Plaintiff's longstanding performance issues and struggle with management skills.  (Doc. #42 at 21); see Alvarez, 610 F.3d at 1266 (stating the defendant need not persuade the court that it was actually motivated by the proffered reason (citation omitted)).  In response, Plaintiff has not produced sufficient evidence of pretext.  Plaintiff asserts that she is in fact a good employee, pointing to her "employment history, evaluations received in the Defendant's Parks and Recreation Department and Diane Flagg's 2009 annual evaluation, recommendations and references contained in [her] file and the fact that Code Enforcement Director Arnold selected [her] over existing investigators with code

enforcement experience because of [her] demonstrated management abilities." (Doc. #48 at 19). "In analyzing claims like [Plaintiff's, the Court] must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees. The factual issue to be resolved is not the wisdom or accuracy of [Defendant's] conclusion that [Plaintiff] was an unsatisfactory employee." Rojas, 285 F.3d at 1342. To the extent Plaintiff disagrees with the basis for the 2010 Evaluation and Defendant's other actions, she does not point to anything specific that was incorrect or false, other than her belief that the actions was premised on her national origin. "[T]he fact that [Plaintiff] thinks more highly of her performance than [Defendant] does is beside the point." Alvarez, 610 F.3d at 1266 (citation omitted); see also Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer."). The record establishes beyond any genuine dispute that Plaintiff had performance issues throughout her tenure. Simply, Plaintiff has not raised a genuine issue of material fact that Defendant's reason is unfounded and that unlawful discrimination is the true reason for the adverse actions to overcome summary judgment.

Accordingly, for the reasons set forth above, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's national origin discrimination claim.

**B. Retaliation**

Under Title VII an employer is prohibited from retaliating against an employee "because [s]he has opposed any practice made unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3. Where, as

here, the plaintiff produces only circumstantial evidence of Title VII retaliation, the McDonnell Douglas burden-shifting framework discussed above again applies.[3]

Under McDonnell Douglas, a plaintiff must first establish a *prima facie* case of retaliation by showing (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action.  See Adams v City of Montgomery, 569 F. App'x 769, 772 (11th Cir. June 20, 2014) (citing Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008)).   The Supreme Court recently clarified that a plaintiff must demonstrate her protected activity was the "but-for" cause of the adverse action to sustain a Title VII retaliation claim.  See Univ. of Texas Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not Title VII's lessened causation test applicable to status-based discrimination; this requires proof that the unlawful retaliation would have occurred in the absence of the alleged wrongful action or actions of the employer.").  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Id.

If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  See Smith v. City of Fort Pierce, 565 F. App'x 774, 776 (11th Cir. Apr. 30, 2014) (citing Crawford, 529 F.3d at 976)).  If the defendant carries this burden,

---

[3] The Court's analysis of Plaintiff's retaliation claim under Title VII applies equally to her claim under the FCRA.  See Alvarez, 610 F.3d at 1271.

the plaintiff must show the defendant's legitimate reasons were pretext for retaliation.  See id. (citing Crawford, 529 F.3d at 976)).

Keeping the aforementioned principles in mind, the Court will address Plaintiff's retaliation claim below.

### 1. *Prima facie* case

The parties do not dispute that Plaintiff engaged in statutorily protected activity by complaining of discrimination to HR and filing the EEOC charge, and that she suffered an adverse employment action by way of the written disciplinary actions.  Since the parties do not dispute the first two elements of Plaintiff's *prima facie* case, the Court will not address them.  As such, the question before the Court is whether Plaintiff has demonstrated a causal connection between her protected activity and the adverse employment action.

"A plaintiff establishes a causal connection by showing that the relevant decision-maker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'"  Smith, 565 F. App'x at 778 (citations omitted).  Pertinent here, a plaintiff can satisfy the causation element "by showing close temporal proximity between the statutorily protected activity and the adverse action. . . . But mere temporal proximity, without more, must be 'very close.'"  Adams v City of Montgomery, 569 F. App'x 769, 772 (11th Cir. June 20, 2014) (citing Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)).  "Although the Eleventh Circuit has not affirmatively decided how much time must elapse between protected activity and an adverse action before temporal proximity, alone, is insufficient to establish causation, it has remarked that 'a three month interval between the protected expression and the

employment action . . . is too long.'" Lowe v. Cardinal Health, Inc. No. 2:13-cv-00833, 2014 WL 5148455, at *8 (N.D. Ala. Oct. 14, 2014) (citations omitted)).

Plaintiff contends that in the three months after her discrimination complaints, Flagg launched a concentrated campaign to "degrade and belittle" her and "create a paper trail of disciplinary action" that she had never before received. (Doc. #48 at 11). Specifically, Plaintiff points to the PIP dated October 28, 2010, and the BAPs dated November 15, 2010, and December 12, 2010, respectively as the principal retaliatory actions. (Doc. #48 at 11-12; Pl.'s Dep. at 321:4-25). In deciding whether Plaintiff has met the causation prong of her *prima facie* case, the Court addresses the PIP and BAPs separately.

### a. PIP dated October 28, 2010

Plaintiff cannot establish a causal relation between her internal discrimination complaints on August 9, 2010 and August 13, 2010, and the PIP dated October 28, 2010 (Doc. #54-1) because the PIP preceded the complaints. See Smith, 565 F. App'x at 779 (finding the plaintiff could not establish a casual relation between the filing of her EEOC Charge and her being placed on administrative leave where the plaintiff had already been placed on administrative leave by the time she had filed in EEOC charge). As discussed, the PIP at issue came about due to Plaintiff's 2010 Evaluation where she received two "Development Required" scores. (Doc. #50-3 at 4). Consequently, Flagg advised Plaintiff that she would receive a PIP and that they would work collaboratively to finalize it. It was not until after Flagg circulated an initial draft that Plaintiff first complained of discrimination. Flagg thereafter suspended efforts to complete the PIP until after HR completed its investigation into her allegations of discrimination. Thus, although Flagg

executed the final PIP on October 28, 2014, she had begun to draft the PIP weeks before Plaintiff's discrimination complaint.   Plaintiff, therefore, cannot use the final PIP as grounds for retaliation.  See Clark v. Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) ("Employers . . . proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatever of causality."); Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) (stating, when an employer contemplates an adverse action before an employee engages in protected activity, temporary proximity between the protected activity and a later adverse action does not "suffice to show causation").

b.  *BAPs dated November 15, 2010, and December 12, 2010*

Without the PIP, Plaintiff's retaliation claim hinges on whether she has demonstrated a causal link between her discrimination complaints and Flagg issuing the BAPs.   Approximately three months lapsed between Plaintiff's initial allegations of discrimination and the first BAP dated November 15, 2010, and approximately four months lapsed before the second BAP dated December 12, 2010.  Consequently, the temporal proximity alone is insufficient to show causation.  See Thomas, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough. . . . Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." (citations omitted)).   Nevertheless, Flagg issued the second BAP only ten days after Plaintiff filed her EEOC complaint.  This close temporal proximity is sufficient to establish a causal connection to satisfy Plaintiff's burden of establishing a *prima facie* case of retaliation.  See Lowe, 2014 WL 5148455, at *8 (finding temporal proximity where, three

weeks after the plaintiff's protected activity, she received a written warning, and five days after that she received a second written warning, and one month after that she was discharged).

### 2.  Legitimate, non-retaliatory reason and pretext

Since Plaintiff presents a *prima facie* case of retaliation, the burden shifts to Defendant to articulate a legitimate, non-retaliatory reason for the BAPs.  Defendant stands behind its position that Flagg disciplined Plaintiff for meritorious reasons, namely longstanding performance issues, management deficiencies, and resistance to mentoring.  (Doc. #42 at 23-25).  Defendant also points to the PIP and an email Plaintiff wrote to the assistant county manager in support of his argument that Plaintiff felt Flagg retaliated against her for a reason other than her Hispanic origin.  (Doc. #42 at 24-25).

Assuming that Defendant's articulated reasons are sufficient to forge ahead in the McDonnell Douglas burden-shifting framework, Plaintiff has presented sufficient evidence for a reasonable jury to find Defendant's reasons to be a pretext for retaliation.  Flagg, the undisputed bad actor, issued the BAPs to Plaintiff with the full knowledge that Plaintiff had accused her of discrimination.  (Flagg Dep. 137:21-138:6).  Additionally, viewing the evidence in a light most favorable to Plaintiff, she offers evidence that the alleged violations Flagg cited her for were "petty and inconsequential" and that Flagg did not issue BAPs for other employees who engaged in similar conduct as Plaintiff.   See Walker v. St. Joseph's/Candler Health Sys., 506 F. App'x 886 (11th Cir. 2013) ("A typical means of establishing pretext is through comparator evidence" (citation omitted)).   For instance, Flagg issued the second BAP to Plaintiff because she, among other things, left her work-issued cell phone at home when she attended a work-related training seminar in Fort

Lauderdale, Florida.  (Doc. #54-3).  Snow testified, however, that he was never disciplined for not having his work-issued cell phone on his person.  (Snow Dep. 36:22-37:9).  Also, Lyberg provides contradictory testimony that "it was the seminar that was at issue," not Plaintiff forgetting her cell phone that warranted the three-day suspension.  (Lyberg 115:15-116:2).  Moreover, because Defendant did not elaborate on the reasons for issuing Plaintiff the BAPs, the issue of whether Plaintiff ultimately acted insubordinately and in violation of Defendant's procedures is not for this Court to referee.

In sum, Plaintiff has presented evidence that could lead a reasonable jury to conclude, if it is so inclined, that Defendant's proffered reasons for her discipline were pretext for retaliation.  The resolution of the retaliation claim hinges on whether the jury believes Plaintiff's version of the events or that of Flagg.  Such credibility determinations are the proper province of a jury, and not the Court.

Accordingly, for the reasons set forth above, the Court denies Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim.

Accordingly, it is now

**ORDERED:**

Collier County's Motion for Summary Judgment (Doc. #42) is **GRANTED in part and DENIED in part**.  The Court grants the Motion as to Count I in the Amended Complaint (Doc. #12), but denies it as to Count II.

**DONE** and **ORDERED** in Fort Myers, Florida this 3rd day of November, 2014.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record